SUMMONS ISSUED                    FILED
                                 CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK    2011 APR 14  PM 12:45

-------------------------------------------------------x    U.S. DISTRICT COURT
NYTDA, INC. a/k/a                                           EASTERN DISTRICT
NEW YORK TRUCKING                                            OF NEW YORK
& DELIVERY ASSOCIATION,
individually and on behalf of all others          :          Civil Action No._____
similarly situated,
                                                  :
              Plaintiff,                                    CLASS ACTION
                                                  :         COMPLAINT
v.
                                                  :         JURY TRIAL
THE CITY OF NEW YORK, ACTING THROUGH              :         DEMANDED
THE TRAFFIC CONTROL DIVISION OF THE NEW           :
YORK CITY POLICE DEPARTMENT AND THE                         GO, MJ
NEW YORK CITY DEPARTMENT OF FINANCE;              :         GARAUFIS, J.
STEPHEN GOLDSMITH; DAVID M. FRANKEL;              :
JAMES TULLER; HARRY J. WEDIN; AND JOHN            :
AND JANE DOES 1-10, ALL IN THEIR                  :
OFFICIAL CAPACITIES,                              :
                                                  :
              Defendants.                         :
_____          :

CV11 - 1836

        Plaintiff, NYTDA, Inc., a/k/a The New York Trucking & Delivery Association

("NYTDA"), by and through its undersigned counsel, brings this Class Action Complaint on

behalf of itself and all others similarly situated against Defendants the City of New York ("the

City" or "NYC"), acting through the Traffic Control Division of the New York City Police

Department, and the New York City Department of Finance, and Stephen Goldsmith, and David

M. Frankel, and James Tuller, and Harry J. Wedin, and John and Jane Does 1-10, all in their

official capacities, alleging upon information and belief, except as to facts and matters that relate

to Plaintiff, which are alleged upon knowledge, as follows:

### NATURE OF ACTION

    1.      This class action seeks maximum equitable and declaratory relief and damages for

a scheme through which Defendants amassed millions of dollars in illegal revenue for the City

from the Plaintiff and other members of the Class that Plaintiff seeks to represent.

2.      The scheme was accomplished through systematic and knowing issuance of illegal parking tickets by civilian traffic enforcement agents employed by the Traffic Control Division ("TCD") of the NYC Police Department ("NYPD") to Plaintiff and other members of the Class who were participants in the City's Stipulated Fine Program for parking ticket resolution, and therefore had no recourse to dispute or appeal mechanisms against said scheme.

3.      From at least May 2006 through October 1, 2010, acting pursuant to official municipal policy, custom and practice and under color of state law, the TCD's "Traffic Enforcement Agents" ("TEAs"), in knowing violation of the City's own parking and traffic laws, rules, and regulations, systematically issued illegal parking tickets to commercial vehicles registered in New York State and operated by Plaintiff and other members of the Class.

4.      In furtherance of Defendants' parking ticket scheme, TEAs systematically and illegally issued tickets to legally double parked vehicles operated by Plaintiff and other members of the Class for "traffic lane" violations (which incur steeper fines), knowing that no tickets should have been issued at all or that, at most, tickets should have been issued only for a double parking violation (resulting in no payment of any fine by class members, as discussed below).

5.      By having knowingly and illegally collected parking fines to which they were not entitled, Defendants collected tens of millions of dollars in unlawful revenue for the City from Plaintiff and other members of the Class, who had no recourse, by virtue of their participation in the Stipulated Fines Program, to defend themselves against what amounted to an illegal tax.

6.      This Complaint alleges claims under 42 U.S.C. § 1983 for violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution and the New York State Constitution, which prohibits identical conduct, N.Y. Const, Article I, §§ 6 and

7(a), for injuries and damages caused by the Defendants in their official capacities as employees, agents and/or servants of the City.

7.     This Complaint also seeks declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and under Rule 57 of the Federal Rules of Civil Procedure implementing that Act.

8.     Plaintiff and the class further seek rescission of all fines illegally collected from them by Defendants, as well as rescission of any purported waiver of rights by Plaintiff and other class members to contest or appeal the tickets, which waivers were fraudulently obtained from Plaintiff and other class members.

## JURISDICTION AND VENUE

9.     This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this Court has original jurisdiction over all civil actions arising under the laws of the United States, including 42 U.S.C. § 1983.  The Court also has jurisdiction over this action under 28 U.S.C. § 1343(a)(1)-(4), which confers original subject matter jurisdiction in this Court over actions involving the alleged deprivation of civil rights.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same common nucleus of operative facts as Plaintiff's federal claims and form part of the same case or controversy.

11.     The Court has jurisdiction over Plaintiff's claim for declaratory judgment and declaratory relief under 28 U.S.C. §§ 2201 and 2202 as implement by Rule 57 of the Federal Rules of Civil Procedure.

3

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Plaintiff NYTDA is located in this District.

## IDENTIFICATION OF PARTIES

### *Plaintiff NYTDA*

13.     Plaintiff NYTDA was formed in November 2004 as a for-profit entity and was incorporated in the State of New York on June 24, 2005.  NYTDA's business address is 1706 Sheepshead Bay Road, Brooklyn, NY 11235.

14.     NYTDA provides fleet management and back office services for the trucking, service and delivery industry.

15.     NYTDA is a membership-based organization which operates under contracts with and powers of attorney from its member clients.

16.     NYTDA operates on proprietary Association and Fleet Management Software designed to manage various fleet operations for its members. One of the crucial services which NYTDA provides to its members is the auditing, management and processing of parking tickets.

17.     NYTDA has processed more than $ 35 million in NYC commercial parking tickets for its members in the past three years alone, which is only a portion of the total parking tickets issued by the City against New York State registered commercial vehicles during that same time period.

18.     NYTDA is paid by its members partly by membership dues, and partly by percentage fees on money which NYTDA saves its members on parking tickets processed and managed by NYTDA.

4

19.     NYTDA's members include trucking and delivery companies whose services are important to the economy of the City and the healthy functioning of retail and commercial businesses here.  NYTDA members deliver essential goods that fuel the economic engine of trade and commerce in the City to all manner of customers, from small "mom and pop" stores to large commercial businesses: milk and eggs to grocery stores, computer ink and toner to commercial printing companies; even the paper upon which the City issues its handwritten parking tickets against the members of the NYTDA.  In short, the delivery services provided by NYTDA members are vital for the functioning of the economy of the City.

20.     In addition to parking ticket administration and processing, NYTDA provides other services to its members, including fleet auditing, insurance reviews, driver training and educational programs, government and legislative representation, and other services.

21.     Among the driver training and education programs offered by NYTDA to its members is the "Best Parking Practices" seminar, which educates its members on City parking laws, rules, and regulations, and advises and educates members on the "Dos" and "Don'ts" of parking in the City under those parking and traffic laws, rules, and regulations.

22.     Plaintiff NYTDA also functions and acts as a clearinghouse and conduit for complaints and concerns of its members about parking and traffic issues, including but not limited to the illegal parking ticket scheme alleged herein.  As alleged in more detail below, NYTDA has worked tirelessly to rectify those issues and concerns with City government officials responsible for administration, oversigh, and official City policy concerning parking and traffic issues.

23.     In connection with those efforts, NYTDA regularly and routinely had direct contact and communication with City officials with regard to the parking complaints and

5

concerns of its members, as it had with respect to the unlawful ticketing scheme alleged herein, both through postal and e-mail communications as well as through face-to-face meetings with City officials and their staff, as alleged in more detail below.

24.     NYTDA not only represents its members with respect to parking and traffic issues in the City, NYTDA is the duly delegated and contractually authorized face and image of those members for these issues.  NYTDA literally stands in the shoes of its members by contract and under powers of attorney with respect to all activities relating to its members, including the processing of parking tickets and citations issued to NYTDA members, as well as advocacy on behalf of its members (and other enrollees in the Stipulated Fine Program) with respect to the alleged illegality of those tickets and citations.

25.     NYTDA has a history of representing the interests of all participants in the Stipulated Fine Program regardless of their membership in the NYTDA including, but not limited to, the new and reduced fine schedule issued by the Finance Department effective July 2009, advocated by NYTDA, which benefited every class member equally whether or not they were members of NYTDA. Further, NYTDA was selected by Defendants themselves, including specifically the NYC Finance Department, as a representative of all enrolled participants in the Stipulated Fine Program to test the electronic commercial payment system of the Program in December 2005.

26.     At all times relevant herein, NYDTA had approximately 430 members who cumulatively operate tens of thousands of delivery trucks in the City.

6

### *Defendant the City of New York*

27.    Defendant the City of New York is a duly constituted municipal entity created and authorized under the laws of the State of New York which, through a Mayor and Council and various departments, bureaus, and agencies, conducts the business and runs the affairs of City government.

28.    Among those bureaus is the Parking Violations Bureau ("PVB"). The City created the PVB several years ago in response to the overwhelming volume of parking citations requiring disposition in the City courts. The PVB now handles those adjudications.

29.    The PVB is headed by a director who is appointed by the Commissioner of Finance pursuant to 4 N.Y.C. ADMINISTRATIVE CODE (hereinafter "NYC AD. C.") §§ 19-200 - 19-201 (1989).

30.    The Chief Administrative Law Judge ("CALJ") of the PVB is Mary Gotsopoulis ("Gotsopoulis"), who as CALJ at all relevant times was and is responsible for overseeing the adjudication of parking tickets by the PVB.

31.    Gotsopoulis is specifically identified by the City in its 2010 "Policymaker List" as an official of the Finance Department with substantial policymaking authority for the City and the Finance Department.

32.    The New York City Department of Finance (the "Finance Department") is a department of the City charged with collecting $ 23 billion annually in tax and other revenue. Among the revenue collected by the Finance Department are fines for parking violations in the City through the PVB.

7

33.     The Traffic Control Division ("TCD") of the New York City Police Department ("NYPD") is a municipal agency responsible for the enforcement of traffic laws and regulations in the City. Through its Traffic Enforcement Agents ("TEAs") it administers among other duties, the issuance of parking tickets pursuant to Section 4-08 of the NYC Traffic Rules.

34.     The TCD is required to comply with and abide by those traffic laws, rules, and regulations and to authorize the issuance of parking tickets by its TEAs only as permitted by those laws, rules, and regulations and not in contravention of those laws, rules and regulations.

35.     Approximately 2,500 TEAs (up from 1,700 in 2001) assigned to the TCD issue more than 4 million citations a year using portable hand held computer ticketing devices (the "parking ticket devices").

36.     At the end of each daily shift, the TEA transfers all ticketing information and data electronically from the parking ticket devices to secure computer servers which, in turn, transmit that data electronically for processing by the Finance Department. The Finance Department receives for processing and stores for recordkeeping the electronic parking ticket together with validating security information.

37.     At all relevant times, the City acted through the New York City Department of Finance, the TCD of the NYPD, and related departments, bureaus, and agencies, as with the individual defendants named below to commit the acts alleged in this Complaint, and was responsible for those acts and conduct.

## *Individual Defendants Goldsmith, Tuller, Frankel, Wedin and John and Jane Does*

38.     Defendant Stephen Goldsmith ("Goldsmith") is NYC's Deputy Mayor for Operations. He oversees the operations of the Department of Finance, and the NYPD, including

8

the Traffic Control Division of the NYPD.  Goldsmith reports directly to Mayor Michael R.

Bloomberg ("Mayor Bloomberg").

39.     As Deputy Mayor, Goldsmith has substantial policymaking authority for the City.

40.     Defendant David M. Frankel ("Frankel") is NYC's Finance Commissioner,

appointed by Mayor Bloomberg on July 29, 2009 to head the City's 2,300 person Finance

Department. As such, Frankel is the chief revenue collection official for the City.

41.     Frankel is specifically identified by the City in its 2010 "Policymaker List" as an

official of the Finance Department with substantial policymaking authority for the City and the

Finance Department.

42.     Defendant James Tuller ("Tuller") is the Commanding Officer of the NYPD

Transportation Bureau. Tuller has headed the NYPD Transportation Bureau since June 2009,

when he succeeded Michael Scagnelli as Bureau Chief. Among the districts within the NYPD

Transportation Bureau is the Traffic Enforcement District.

43.     Tuller is specifically identified by the City in its 2010 "Policymaker List" as an

official of the NYPD with substantial policymaking authority for the City and the NYPD

44.     Defendant Harry J. Wedin ("Wedin") is the Commanding Officer of the

Operations Division of the NYPD. Weldin has headed the Operations Division since at least

2001, first as an Inspector and then as an Assistant Chief, having been promoted to that latter

position by NYC Police Commissioner Raymond W. Kelly in October 2003.

45.     Wedin is specifically identified by the City in its 2010 "Policymaker List" as an

official of the NYPD with substantial policymaking authority for the City and the NYPD.

9

46.     Defendants Goldsmith, Frankel, Tuller, and Wedin are and were, at all times relevant to this Complaint, policymakers responsible for establishing and administering final City policy with respect to the unlawful practices and conduct alleged herein.

47.     The positions of Defendants Goldsmith, Frankel, Tuller, and Wedin with the City make them directly responsible for the actions and conduct of their subordinates whose roles were essential to the success of the illegal parking ticket scheme alleged herein.

48.     Defendants John and Jane Does 1-10 are individuals presently unknown to Plaintiff who, at all relevant times, were employees, agents, servants and/or officers of the City or of its departments, bureaus, or agencies, and were involved or participated in the unlawful acts, practices, and conduct alleged in this Complaint.

49.     The John and Jane Doe Defendants include individuals who assisted and/or directly engaged in the violations of the Plaintiff's and the class' rights alleged herein.

50.     At all times relevant hereto, each of the individual Defendants acted under color of state law in the course or scope of his or her duties and functions as an employee, agent, servant, or officer of the City, the NYC Finance Department, the NYPD and/or the TCD of the NYPD in engaging in the conduct alleged herein.

51.     At all time relevant hereto, the individual defendants have acted for and on behalf of the City, the NYC Finance Department, the NYPD and/or the TCD, and incidental to the lawful pursuit of their duties as employees, agents, servants or officers of the City, the NYC Finance Department, the NYPD and/or the TCD of the NYPD.

**FACTUAL ALLEGATIONS**

**Parking Tickets Intended to "Generate" Revenue for the City: A Call to Action to
Pre-Determine Substantial Increases in Parking Citations**

52.     In June 2004, responding to a severe loss in revenue from a depressed economy,
Mayor Bloomberg issued a revised Fiscal Plan to address the City's deficits by, among other
things, tasking the Department of Finance with "generating" 1.7 million additional parking
tickets over a period of five years.  Specifically, the revised Fiscal Plan called for helping to
bridge the budget gap by strategically deploying an additional 300 civilian TEAs in congested
areas throughout the City, thereby "generating approximately 1.7 million additional parking
summonses." The Plan allocated an additional $5 million to specifically fund those efforts.

53.     The City projected that this initiative would generate at least an additional $27
million in revenue specifically from its parking ticket operations.

54.      While the City's budget reduction initiatives at the time included severe cuts to
City services and a reduction in the overall budget of the NYPD, the Plan added funding for
TEAs working for the TCD to "generate" additional parking citations over a period of five years.

55.     According to the Mayor's Management Report for Fiscal Year 2010 issued in
September 2010, parking fines generated $604.8 million in revenue collected by the Finance
Department for that fiscal year.

56.     The 2010 parking summons revenue represented an increase from $560 million
for fiscal year 2009 and a steady increase in annual parking fines revenues from previous years.

57.     The Mayor's 2004 Plan indicated that the NYPD's actual budget would be cut by
an additional $122 million by fiscal year 2005.  The Plan, however, gave the City Finance

Department's PVB a net budget increase of more than $1 million -- specifically targeted towards

raising revenue from additional parking tickets to be generated by civilian TEAs, as opposed to

other NYPD officers.  While increasing the budget of civilian TEAs, the Mayor's Plan removed

$2.2 million from the funds  previously allocated to non-civilian NYPD officers for the

"[i]ssuance of tickets, summonses, complaints, and other processes for the violations of such

[parking] laws, rules, and regulations."

### *The Typical Parking Ticket Adjudication Process*

58.     The Director of the PVB appoints a number of hearing examiners, whose duties

include presiding at hearings for the adjudication of charges of parking violations.  NYC AD. C.

§ 19-202.

59.     Someone accused of a parking violation is served with a notice of violation,

commonly called either a summons, citation or parking ticket.  *Id.* § 19-204.  The recipient may

plead guilty and pay the prescribed fine, or plead not guilty, usually by mail, or else in person or

via the internet.  If a plea of not guilty is entered, the PVB notifies the defendant vehicle owner

of a hearing date. *Id.* § 19-206.

60.     A party convicted of a parking violation may appeal the conviction to an appeals

bureau within the PVB. *Id.* § 19-208.

61.     Orders of the appeal board may typically be reviewed in the New York State

Supreme Court in proceedings under Article 78 of the Civil Practice Law and Rules. *Id.* § 19-

209.

62.     However, the process of adjudicating parking tickets is time-consuming and expensive for both parties (the defendant commercial vehicle owner and the City), often costing more to contest or adjudicate the citation than the amount of the potential fine.

63.     Out of approximately 10 million parking tickets issued by various City agencies each year, approximately 1.2 million are contested through hearings before the PVB.

### ***The Stipulated Fine Program***

64.     Given the high volume of parking tickets issued to commercial vehicles in the City and the enormous demands on the time and resources of both the City and the owners/operators of those vehicles, the City -- through its Finance Department -- initiated a "Stipulated Fine Parking Program" (sometimes hereinafter referred to as the "Program") to deal with the crushing burden on the adjudicatory and appeal processes of the PVB.

65.     The Stipulated Fine Program was launched in July 2004, just one month after the Mayor declared in his revised Fiscal Plan that an additional 1.7 million parking tickets should be "generated" over the next five years by 300 new TEAs added to the ranks of the TCD.

66.     The Stipulated Fine Program replaced that adjudicatory and appeal process in its entirety for all participants enrolled in it, thereby reducing huge costs to and burdens on the PVB from those hearings and appeals.

67.     Participants in the Stipulated Fine Program "stipulate," without recourse to hearings or appeals, to fines set by the City based on schedules derived from actual average hearing results. The intent of the Stipulated Fine Program is to save the City the costs and burden of hearings, adjudications and appeals while providing commercial vehicle operators with purportedly "fair" settlements of parking violations without the undue expenditure of fees for

attorneys or time spent in hearings.  True and correct copies of an "Application for Stipulated

Fine Parking Programs," an "Enrollment Agreement" and a "Stipulated Fine Schedule" for

January 2010 are collectively attached hereto as Exhibit 1 and incorporated herein by reference.

     68.     As indicated in the attached Exhibit 1, the Stipulated Fine Program includes

categories of fines deemed to be "amenable," "partially amenable" and "non-amenable." These

categories are determined based on the specific Violation Code cited in the parking ticket and

actual experience at adjudicatory hearings for those violations.

### *Double Parking Citations Are "Fully Amenable"*

     69.     Section  4-08(F)(1) of the Traffic Regulations authorizes a ticket for double

parking for commercial vehicles (Violation Code 46) only if there is an unoccupied space within

100 feet of the commercial vehicle on either side of the street, or the commercial vehicle has

been double parked for more than 30 minutes with no visible activity.[1]

     70.     It is rare in New York City for an unoccupied parking space to be available within

100 feet for a commercial vehicle, especially during normal business hours.

     71.     Since the reason that commercial vehicles double park is to make deliveries or

service calls, lack of visible activity at the parking site for more than 30 minutes is also rare.

     72.     Because of these facts, parking tickets issued to commercial vehicles for double

parking (Violation Code 46), are routinely and summarily dismissed at PVB hearings based on

minimal evidence that that alleged violator was engaged in expeditious delivery or service calls.

---

[1] Variations of these parking laws and regulations apply to the so-called "Midtown core" between 1st Avenue to 7th Avenue and from 14th Street to 60th Street.

73.     The Stipulated Fine Program recognizes and continues this exception, by automatically and summarily reducing the fine to "$ 0" for commercial vehicles cited for Violation Code 46, which is therefore a fully "amenable" category of fine. (Exhibit 1).

## *"Traffic Lane" Citations Are Only "Partially Amenable"*

74.     Section 4-08(E)(1) of the Traffic Regulations (Violation Code 45) prohibits parking in a lane intended for the free movement of vehicles, and authorizes a citation for such violations, except as to commercial vehicles which are double parked in accordance with the exception provided in Section 4-08(F)(1).

75.     Citations for traffic lane (Code 45) violations result in findings of guilt and assessment of fines approximately one third of the time at hearings before the PVB.

76.     These traffic lane violation statistics are similarly reflected in the fines in the Stipulated Fine Program for this specific Violation Code 45.

77.     Violation Code 45 fines are only "partially amenable" in the Stipulated Fine Program. Participants' fines are reduced from $115 per ticket to a "partially amenable" fine of $ 40. (Exhibit 1).

78.     No citations for traffic lane (Code 45) violations can be lawfully issued to double parked commercial vehicles engaged in delivery or service within a 30 minute window of time. If no activity is observed for 30 minutes, then the only ticket that a TEA can lawfully issue under governing NYC traffic and parking rules and regulations is one for a double parking (Code 46), which, as noted above, is "fully amenable" to $ 0 for participants in the Stipulated Fine Program.

79.     A TEA does not have to wait 30 minutes before issuing a citation for a traffic lane violation (Code 45).

15

80.     Because participants in the Stipulated Fine Program have no right to a hearing before the PVB or to any appeal from any adverse adjudication, participants in the Program (even those who were in fact legally double-parked while effecting commercial deliveries) have no recourse to appeal if they receive "traffic lane" tickets, and must pay the $40 fine, even for tickets issued illegally and in violation of the City's own parking laws, rules, and regulations.

81.     During the relevant period of this complaint, TEAs issued virtually no tickets for double parking. Instead, as alleged below, during the relevant period, the TEAs were directed by the City to issue traffic lane tickets, and did so, without regard for equity, but solely in order to generate more revenue for the City at the expense of commercial vehicle owners.

### *Plaintiff's Participation in the Stipulated Fine Program*

82.     The NYTDA, on behalf of its members under powers of attorney granted by those clients, is a participant in the Stipulated Fine Program for its members, and has been since 2005.

83.     The NYTDA signs the applications of its members, pursuant to powers of attorney granted by its members to the NYTDA, for their participation in the Stipulated Fine Program.

84.     Participants in the Stipulated Fine Program such as Plaintiff and its members register their vehicle license plates with the City.

85.     The NYC Department of Finance sends lists of parking violations for those registered vehicles electronically on a weekly basis in fleet reports issued to participants in the Stipulated Fine Program.

86.     Because the NYTDA is a participant in the Stipulated Fine Program and administers and processes parking tickets for its members under powers of attorney granted to NYTDA by its members, the City Finance Department transmits those parking violation reports

16

for NYTDA-member companies directly to the NYTDA.  A true and correct copy of a sample of such a report is attached hereto as Exhibit 2.

87.     Because of the large number of its members enrolled in the Stipulated Fine Program, NYTDA receives more fleet reports than any other Stipulated Fine Program participant. Fleet reports list the numbers of violations issued, the violation categories and the stipulated amount due for each weekly period.

88.     Based on those fleet reports, NYTDA, on behalf of its members, makes payment to the NYC Department of Finance, primarily electronically but in some instances by check.

89.     Other class members who are self-enrolled in the Stipulated Fine Program receive the violation reports and make payment to the City in the same manner (i.e., either electronically or by check).

90.     In exchange for the purportedly accurate, fair, and legal operation and administration of the Stipulated Fine Program, alleged violators waive any right to a hearing to contest the parking tickets.

91.     But the Stipulated Fine Program has not been been operated and administered in an accurate, fair, and legal manner. Instead, pursuant to municipal policies and practices, the Stipulated Fine Program has been systematically administered by the City in a fraudulent manner, in direct and knowing violation of the City's own parking laws and regulations, in order to maximize revenue for the City at the expense of Plaintiff and the class.

92.     The Stipulated Fine Program, admirable in theory, and efficient and effective when administered properly and lawfully, has instead been operated in a fraudulent manner.

93.     Defendants, at all relevant times, had a deliberate and systematic policy and practice of knowingly, contrary to the City's own mandatory parking laws, rules, and regulations, issuing and/or causing to be issued, to Plaintiff and other class members who had no recourse to dispute or appeal, on a systematic basis unlawful tickets for traffic lane violations instead of appropriate, but "fully amenable," double parking citations,

94.     This systematic policy and practice on the part of Defendants has resulted in the collection of tens of millions of dollars in illegal fines from Plaintiff and other class members without due process of law and in direct and clear violation of their Federal and State Constitutional rights.

### *Parking Ticket Practice and Procedure as Observed  in the Stipulated Fine Program*

95.     Parking tickets issued by NYPD police officers are readily identifiable; each ticket they issue begins with the prefix "1" and is written by hand. A true and correct sample of a "Notice of Parking Violation" issued by a NYPD Police Officer is attached hereto as Exhibit 3.

96.     Parking tickets issued by civilian TEAs of the Traffic Control Division of the NYPD are equally identifiable;  each begin with the prefix "7."  Tickets issued by TEAs are created and printed electronically through the portable, hand held devices described above. A true and correct sample of a "Notice of Parking Violation" issued by a TEA is attached hereto as Exhibit 4.

97.     The operation of parking ticket devices require the TEA to merely input the vehicle registration and violation data, affix a digital issuer signature by the TEA, and print and issue the ticket.

18

98.     NYPD police officers and TEAs are not segregated geographically in their operations. All work throughout the City in the same boroughs, neighborhoods, and streets.

99.     Approximately 70% of all double parking and traffic lane tickets issued to both commercial and non-commercial vehicles in the City are issued by TEAs. The remaining 30% of such tickets are issued by NYPD police officers, or by other agencies.

100.    According to the fleet reports of parking violations provided by the Finance Department to NYTDA, of the approximately 60,000 double parking and traffic lane tickets issued to NYTDA members by TEAs between May 2006 and October 2010, ***99% of those tickets were for traffic lane (Code 45) violations***. During that period, double parking tickets issued by TEAs to NYTDA members vanished to the point of non-existence.

101.    Such a high percentage of traffic lane tickets is statistically inconceivable and obviously fraudulent, given the undeniable dearth of parking spaces for commercial vehicles during normal business hours in the City.   Since parking was almost certainly unavailable in 99% or more of cases, all traffic lane tickets issued by TEAs to Plaintiff and class members engaged in deliveries or service calls could only lawfully have been issued under Violation Code 46 for double parking. But as noted above, double parking violations are fully amenable to "$0" under the Stipulated Fine Program, and, therefore, would have generated no revenue at all for the City. Therefore, Defendants instead of following their own laws systematically and deliberately issued these illegal but fine-collecting "traffic lane" tickets as alleged above.

102.    Before this revenue-raising scheme began in 2005-2006, double parking tickets issued by TEAs to commercial vehicles were generally in compliance with NYC traffic laws, rules and regulations.

103.    However, systematic changes in practice and procedure were implemented by Defendants in 2006, which, as proven by Defendants' own statistics from May 2006 through October 2010, can only be logically and credibly explained as a concerted and calculated effort to generate increased revenue through the issuance of unlawful traffic lane tickets.

104.    TEAs, following the City's rigged ticketing scheme, systematically and unlawfully ticketed Plaintiff and other class members for traffic lane violations in an astonishing *99%* of all cases tracked from May 2006 through October 2010.

105.    There is no innocent explanation for the fact that in a City where available parking spaces for commercial delivery and service vehicles during business hours are virtually non-existent, between May 2006 and October 2010, 99% of all double parking and traffic lane tickets issued by TEAs to New York State registered commercial vehicles, were for "traffic lane" violations—as documented by Defendants' own data.

106.    By devising and implementing a rigged traffic ticket scheme, Defendants have misappropriated tens of millions of dollars from Plaintiff and the class.

### *NYTDA's Efforts to Obtain Explanations for Parking Ticket Irregularities*

107.    As discussed above, the City sends weekly fleet reports to Plaintiff NYTDA, which list the Violation Codes for parking tickets issued to NYTDA members and the total amount due under the Stipulated Fine Program.

108.    Having noticed oddities in the number and type of tickets issued to his members, Kenneth J. Thorpe ("Thorpe"), NYTDA's Chairman and Chief Executive Officer, began compiling data on parking violations issued by Defendants in an effort to ascertain and identify the nature and magnitude of any irregularities.

109.    On March 10, 2008, Thorpe sent a letter via FedEx to Raymond W. Kelly ("Kelly"), the NYC Police Commissioner under whose department the TCD and TEAs fall, specifically pointing out that traffic lane and double parking laws and regulations were being routinely and illegally misapplied by TEAs to commercial vehicles.  Thorpe stated that "almost all traffic lane violations that are issued are double parking violations amenable under the double parking violation exception for commercial vehicles…."  Thorpe advised Kelly that "[a]s a result thereof, many thousands of tickets issued that are amenable under the commercial vehicles' expeditious delivery/service rules are only partially amenable under traffic lane rules."  The effect of this inappropriate and outright unlawful ticketing practice, according to Thorpe's letter to Kelly, was "placing an undue financial burden upon trucking and delivery in the form of fines that by law should be fully amenable…."

110.    NYC Police Commissioner Kelly received, but never responded to Thorpe's letter.

111.    In an e-mail to CALJ Gotsopoulis dated August 1, 2008, Thorpe followed up on previous meetings and correspondence with Gotsopoulis in and before October 2007, about the improper issuance of traffic lane tickets to double parked commercial delivery vehicles.

112.    On August 11, 2008, Gotsopoulis e-mailed Thorpe, thanking him for "keeping her in the loop" on the parking ticket issue.   However, she took no further action on the traffic lane violation issue, despite having actual and detailed knowledge of the problem.

113.    On March 23, 2009, armed with additional data, Thorpe e-mailed the then-Commissioner of the NYC Department of Finance, Martha E. Stark ("Stark"), who implemented the Stipulated Fine Program in 2004.

114.    In his March 23, 2009 letter, Thorpe was following up on previous direct, face-to-face conversations with Stark.  Thorpe noted that even the most conscientious members of the NYTDA were receiving traffic lane tickets at the same time that the Finance Department's own fleet reports of violations indicated that few double parking tickets were being written by TEAs at all.  As mentioned above, in New York City, this is clearly statistically impossible.

115.    Stark replied to Thorpe in an e-mail that same day, stating that the City was "monitoring it as well" and would report back to Thorpe on the City's "findings" about the improper ticketing by TEAs.

116.    On May 28, 2009, following promises from Stark that the City was "monitoring" the situation and having accumulated and analyzed even more data, Thorpe wrote to Rochelle Patricof ("Patricof"), First Deputy Commissioner at the Finance Department, about the illegal traffic lane tickets issued by TEAs.  In his e-mail, Thorpe again stated that 99% of all tickets being issued by TEAs to NYTDA members were for traffic lane violations, and demanded the promised results of the City's "findings."

117.    Thorpe's May 28, 2009 e-mail to Patricof followed their personal, face-to-face conversations, during which Patricof assured Thorpe that, as part of the promised "monitoring" by the Finance Department and eventual (but never produced) report of its "findings" on the improper traffic lane tickets, Patricof would contact the NYPD to get answers to NYTDA's questions and concerns.

118.    During subsequent conversations with Thorpe, Patricof told Thorpe that both she and Stark had spoken with officials at the NYPD about the problem, but never shared any details about those discussions or any results or conclusions.

119.    Two months later, on July 28, 2009, Thorpe again e-mailed Patricof, repeating that the unlawful issuance of traffic lane tickets by TEAs continued to be a serious and costly problem for NYTDA members, that Patricof's and Stark's communications with the NYPD had not yielded any positive results, and again demanding an explanation for and immediate correction of those practices.

120.    Thorpe heard nothing further from anyone in the City about the questions, concerns, and complaints which he had conscientiously and vigilantly made on behalf of the NYTDA's members to top officials and policymakers of the City.

121.    Between May 2006 and October 1, 2010, *99.6%* of all tickets issued by TEAs for double parking and traffic lane violations to NTYDA members with New York State registered commercial vehicles were "traffic lane" tickets.

122.    During that same period from May 2006 to October 1, 2010, Plaintiff NYTDA and its members paid more than $ 5 million in "stipulated" fines for purported "traffic lane" violations which never occurred.

123.    The fines were illegal, since these "traffic lane" tickets  issued by the TEAs were not authorized by law, and were in clear and direct violation of applicable traffic laws, rules, and regulations, and, indeed, were outright fraudulent.

### The "Traffic Lane" Scheme is Finally Acknowledged and Exposed

124.    It was not until October 1, 2010 that the City finally owned up to its illegal revenue-generating scheme.  In a Memorandum to "All Parking Enforcement Personnel" in the City, Michael Pilecki ("Pilecki"), Deputy Inspector and Commanding Officer of the Parking Enforcement District, "reminded" TEAs under his command emphatically in bold type:

"Under **NO CIRCUMSTANCES** should a summons be issued to a double parked commercial vehicle for **OBSTRUCTING A TRAFFIC LANE**"

(Emphasis in original).

125.    Pilecki further "reminded" the TEAs that tickets for double parked commercial vehicles making deliveries or service calls may be lawfully issued, if at all, only for a double parking (Code 46) violation.  A true and correct copy of the October 1, 2010 Memorandum is attached hereto as Exhibit 5.

126.    From October 1, 2010 through the date of the filing of this Complaint, traffic lane tickets issued by TEAs plummeted from an astounding 99% of all citations issued to just *1%* of citations issued. This complete reversal of ticket-issuance statistics following the October 1, 2010 Memorandum is compelling evidence of the illegality of Defendants' prior conduct.

127.    But the damage had already been done to Plaintiff and other class members.  The City already had misappropriated tens of millions of dollars in fines for "traffic lane" violations for legitimately double parked New York State registered commercial vehicles.  The fines had been collected from citations which never should have been issued, as they violated the City's own parking laws and regulations, yet from which there was no recourse or appeal.

128.    Furthermore, dues-paying members of NYTDA entrust NYTDA to process and administer parking tickets issued to members enrolled in the Stipulated Fine Program in an appropriate manner.  This includes but is not limited to, entrusting NYTDA to make payments of fines on behalf of its members only for lawfully issued parking violations, as opposed to fines payments for citations which violate the City's own parking laws, rules, and regulations.

133.     Tasked with generating 1.7 million additional parking tickets and corresponding additional revenue from parking violations, the Stipulated Fine Program -- salutary in theory but corrupt in practice and operation -- became instead a vehicle for revenue generation against Plaintiff and members of the class.

134.     But for the Stipulated Fine Program and the purported waivers that Defendants obtained by inducing Plaintiff's and other class members' participation in it, Plaintiffs would have vigorously contested their rights in the PVB's hearing, adjudication, and appeal process, or in Article 78 proceedings.  But Plaintiff and other class members chose to participate in the Stipulated Fine Program, not realizing that it was essentially rigged as administered through Defendants policy, practice, and custom.

### *Individual Defendants Goldsmith, Frankel, Tuller  and Wedin Are City Policymakers*

135.     Defendants Goldsmith, Frankel, Tuller, and Wedin are "policymakers" under 42 U.S.C. § 1983 because their acts represent and constitute official City policy.

136.     Defendants Goldsmith, Frankel, Tuller, and Wedin were responsible either for promulgating the alleged policies, practices, or customs alleged herein, or for deliberately permitting subordinates to promulgate and pursue them.

137.     Defendants Goldsmith, Frankel, Tuller, and Wedin knew, or in the exercise of diligence should have known, that the Stipulated Fine Program was being operated and administered in the unlawful manner described above.

138.     Defendants Goldsmith, Frankel, Tuller, and Wedin, in addition to being policymakers, were, at all relevant times, supervisory personnel, with oversight or responsibility for the training, instruction, and supervision of the operators and administrators of the Stipulated

Fine Program, and/or also, for ensuring that TEAs and other City agents duly issued proper and lawful parking tickets under the Stipulated Fine Program—and not systematically illegal ones.

139.    Defendants Goldsmith, Frankel, Tuller, and Wedin failed to train, instruct, and supervise their subordinates and others charged with the lawful operation and administration of the Stipulated Fine Program as to the proper issuance of tickets and collection of fines under the Stipulated Fine Program.

140.    Defendants Goldsmith, Frankel, Tuller, and Wedin instead, with deliberate indifference and/or tacit or active authorization, permitted and encouraged City policies, practices, and customs which resulted in the illegal ticketing-revenue scheme under the Stipulated Fine Program as alleged herein, all as part of their policies, practices, and customs.

141.    Defendants Goldsmith, Frankel, Tuller and Wedin sanctioned and ratified the illegal conduct and actions of City TEAs, the TCD, and the Finance Department through their active encouragement of, deliberate indifference to and/or tacit authorization of said conduct.

142.    Defendants Goldsmith, Frankel, Tuller and Wedin were each in a position to take corrective action to stop the illegal parking ticket revenue generation scheme, but failed to do so.

143.    Defendants Goldsmith, Frankel, Tuller and Wedin were each in a position to influence others to take corrective action to stop the said illegal scheme, but failed to do so.

144.    Because they knew or should have known of the wrongful conduct alleged herein either directly or through their predecessors or subordinates, Defendants Goldsmith, Frankel, Tuller and Wedin and their predecessors and subordinates, at a minimum, should have suspended collection of all illegal fines pending the "monitoring" of the situation and report of the City's "findings" to Thorpe as promised—but they failed to do so.

### *Other Predicate Allegations*

145.    The issuance of illicit traffic lane tickets to New York State registered commercial vehicles renders the purported waivers that the City obtained from the class void *ab initio*. The purported waivers were procured by fraud and were based on false predicates of fact including, but not limited to, the fact that the tickets the City issued under the Program would be lawful and not systematically issued in violation of the City's own laws solely in order to unlawfully extract fines from Plaintiff and other class members who were defenseless by virtue of participation in the Stipulated Fine Program.

146.    Defendants are "persons" acting or who acted "under color of state law."

147.    Defendant NYC is a municipal entity created and authorized under the laws of the State of New York. The City would not exist, operate and function without the powers, duties and authority conferred on it through the State of New York. Further, the illegal activities alleged herein targeted New York State registered commercial vehicles, whose registration and other fees benefit the State.

148.    Defendants' implementation, regulation, administration and enforcement of the illegal ticketing scheme deprived Plaintiffs and other class members of their right to property and due process, all of which are secured by the United States Constitution, the New York State Constitution, and the laws of the United States and the State New York.

149.    As a direct and proximate result of the actions and conduct of the Defendants described above, Plaintiffs and other class members suffered the deprivation of their federal and state Constitutional rights, and have sustained damages.

### *Other Predicate Allegations*

145.    The issuance of illicit traffic lane tickets to New York State registered commercial vehicles renders the purported waivers that the City obtained from the class void *ab initio*. The purported waivers were procured by fraud and were based on false predicates of fact including, but not limited to, the fact that the tickets the City issued under the Program would be lawful and not systematically issued in violation of the City's own laws solely in order to unlawfully extract fines from Plaintiff and other class members who were defenseless by virtue of participation in the Stipulated Fine Program.

146.    Defendants are "persons" acting or who acted "under color of state law."

147.    Defendant NYC is a municipal entity created and authorized under the laws of the State of New York. The City would not exist, operate and function without the powers, duties and authority conferred on it through the State of New York. Further, the illegal activities alleged herein targeted New York State registered commercial vehicles, whose registration and other fees benefit the State.

148.    Defendants' implementation, regulation, administration and enforcement of the illegal ticketing scheme deprived Plaintiffs and other class members of their right to property and due process, all of which are secured by the United States Constitution, the New York State Constitution, and the laws of the United States and the State New York.

149.    As a direct and proximate result of the actions and conduct of the Defendants described above, Plaintiffs and other class members suffered the deprivation of their federal and state Constitutional rights, and have sustained damages.

150.    Defendants' illegal ticketing scheme was a municipal policy, practice and custom, as evidenced by data collected and analyzed from the City's own fleet reports and as belatedly acknowledged by the City in Pilecki's October 1, 2010 Memorandum.

151.    To date, the City has collected more than $ 5 million from NYTDA members alone through its illegal ticketing scheme, and it is estimated that all class members have suffered identical losses and deprivations of property in the aggregate totaling more $50 million.

## CLASS ACTION ALLEGATIONS

152.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class, which shares the same common and uniform claims as Plaintiff NYTDA, which alone had approximately 430 members at all times relevant herein and powers of attorney to represent their interests here:

> All commercial delivery companies, commercial vehicle owners/operators, commercial service companies and other persons and entities who owned and/or operated New York State registered commercial vehicles who during the period June 1, 2006 to the present participated in the City's Stipulated Fine Program.

(the "Class").

153.    The Class is so numerous that joinder of all members is impracticable.  Although the precise size of the class (and any separate classes or sub-classes that may be appropriate under Rule 23(c)(5)) is presently unknown to Plaintiff, this information is easily obtainable from Defendants' records.  It is estimated that the Class consists of thousands of commercial delivery operators in NYC who own and/or operate tens of thousands of New York State registered commercial vehicles in the City.

154.    There are questions of law or fact common to the Class, which predominate over any questions affecting only individual Class members.  Among the principal common and predominating questions of law or fact in this case are the following:

a) whether the City, through the Finance Department, the TCD of the NYPD, related departments bureaus and agencies and/or the individual defendants, authorized, implemented, followed and/or permitted policies, practices and procedures which resulted in the issuance of improper traffic lane tickets by TEAs, thereby causing the Stipulated Fine Program to be operated and administered in a manner which resulted in the unlawful collection of fines;

b) whether the TEAs violated the City's own parking laws and regulations by systematically issuing illegal traffic lane violations to Class members;

c) whether Defendants deprived Class members of their Constitutional rights through the operation and administration of the Stipulated Fine Program; and

d) what and when City officials knew about the illegal ticketing scheme.

Whether Defendants violated Section 1983 and other laws can easily be determined from Defendants' automated systems and electronic records, programmed to store and retrieve data and information as described herein.

155.    Plaintiff's claims are typical of the claims of the Class, which all arise from the same operative facts and are based on the same legal theories. Moreover, there are no defenses available to Defendants that are unique to Plaintiff.

156.    Plaintiff will fairly and adequately protect the interests of the Class and is committed to vigorously pursuing this litigation. Further, Plaintiff has retained counsel who are highly experienced in handling class actions, particularly large complex class actions involving substantial sums of money and complicated legal and factual issues.

157.    Neither Plaintiff nor its counsel have any interests which conflict with or are antagonistic to those of the Class or which might cause them to not vigorously pursue this action.

158.    This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for the parties opposing any Class, as well as a risk of adjudication with respect to individual members, which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impede or impair their ability to protect their interests.

159.    A class action is a superior method for the fair and efficient adjudication of this controversy.  The interests of Class members in individually controlling the prosecution of separate claims against Defendants may be small given the amount of the actual damages at issue for each Class member and the burdens on their time and resources, but which in the aggregate are estimated to involve tens of millions of dollars.  Management of the action as a class action is likely to present significantly fewer difficulties than those presented by the assertion of thousands of individual claims.  The identities of Class members can easily be obtained from Defendants' computerized and electronic records for the Stipulated Fine Program.

## COUNT I

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983
#### *U.S. Constitutional Violations*

160.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth in complete detail below.

161.    Defendants, acting under color of state law, subjected Plaintiff and other Class members to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. § 1983, thereby depriving Plaintiff and the Class of their rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following Constitutional rights:

> a) freedom from unreasonable seizures and unlawful taking of property; and

> b) freedom from deprivation of property without due process of law.

162.    Plaintiff and other Class members have a property interest in the monies which were unlawfully appropriated from them by Defendants as purported fines under the illegal ticketing scheme described above.

163.    As a direct and proximate result of Defendants' deprivation of their federal Constitutional rights, Plaintiff and the Class have suffered damages in the manner and amounts set forth above.

## COUNT II

### SECOND CAUSE OF ACTION
### NY Const, Article I, § § 6 and 7
### *Violations of New York State Constitution*

164.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth in complete detail below.

165.    Defendants, acting under color of state law, subjected Plaintiff and other Class members to the foregoing acts and omissions without due process of law and in violation of the New York State Constitution, thereby depriving Plaintiff and the Class of their rights secured by

Article I, Sections 6 and 7 of the New York State Constitution, including, without limitation, deprivation of the Constitutional rights of:

      a)  freedom from unreasonable seizures and unlawful taking of property; and

      b) freedom from deprivation of property without due process of law.

166.    Plaintiff and other Class members have a property interest in the monies which were unlawfully appropriated from as purported fines under the illegal ticketing scheme described above.

167.    As a direct and proximate result of Defendants' deprivation of their state Constitutional rights, Plaintiff and the Class have suffered damages in the manner and amounts set forth above.

## COUNT III

### THIRD CAUSE OF ACTION
#### *Rescission*

168.    Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth in complete detail below.

169.    Plaintiff and other Class members entered into the Stipulated Fine Program with the reasonable expectation and belief that the tickets issued would be lawful and proper and not in systematic violation of the City's own parking laws solely to generate revenue for the City in violation of the rights of Class members.

170.    Defendants used the Stipulated Fine Program as an illegal way to levy, assess, and collect illegal fees in what was essentially an illegal tax on Plaintiff and other class members.

171.   As a result of Defendants' systematically fraudulent conduct, any purported waivers of Plaintiff's or Class members' rights under the Stipulated Fine Program are void, unenforceable, and subject to rescission.

172.   Plaintiff and other Class members are further entitled to rescission and return of all fines collected under the illegal parking scheme alleged herein.

## COUNT IV

### FOURTH CAUSE OF ACTION
### *Declaratory Judgment*

173.   Plaintiff repeats and re-alleges each and every allegation set forth above as though fully set forth in complete detail below.

174.   Plaintiff seeks declaratory relief and judgment as matters alleged herein are subject to disposition as a matter of law pursuant to 28 U.S.C. § 2201 and 2202.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all matters so triable.

**WHEREFORE,** Plaintiff demands judgment against Defendants on the claims alleged herein as well as the following additional and further relief:

(a) an Order certifying this case as a class action;

(b) compensatory damages to Plaintiff and the Class for their injuries suffered by reason of Defendants' unlawful conduct alleged herein;

(c) relief against Defendants sufficient to deter such conduct in the future and prevent the deprivations of rights and other violations of law described above;

(d) a declaration that Defendants' conduct violated Plaintiff's and the Class' federal and state Constitutional and civil rights;

(e) a declaratory judgment that the operation and administration of the Stipulated Fine Program in the manner in which it was operated by Defendants or permitted to be operated by Defendants was and is unconstitutional and unlawful as a matter of law;

(f) an Order enjoining Defendants from conducting the illegal ticketing scheme and operating and administering the Stipulated Fine Program in the manner alleged herein in the future;

(g) an Order requiring Defendants and those under their supervision, control, and/or influence to train, instruct, and supervise persons who operate and administer the Stipulated Fine Program and the activities of TEA agents about traffic laws and regulations governing traffic lane and double parking violations for commercial delivery vehicles;

(h) attorneys' fees under 42 U.S.C. § 1988(b) and other provisions of law;

(i) the costs and expenses of this action; and

(j) such other and further relief as the Court deems just, proper and appropriate.

Dated: April 14 , 2011
New York, New York

_Julian H. Lowenfeld_

**Julian H. Lowenfeld** (JHL-9387)
350 Central Park West Suite 13-C
New York, New York 10025
Telephone: (917) 375-9996
Facsimile: (917) 534-6090
JLowenfeld@gmail.com
**Attorney for Plaintiffs**

Kenneth A. Jacobsen
**JACOBSEN LAW OFFICES LLC**
12 Orchard Lane
Wallingford, PA 19086
Telephone: (610) 566-7930
**Jacobsenlaw@AOL.com**


Michael J. Boni
Joanne Zack
**BONI & ZACK LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: (610) 822-0201
**mboni@bonizack.com**


Joseph A. O'Keefe
**O'KEEFE & SHER, P.C.**
15019 Kutztown Road
Kutztown, PA 19530
Telephone: (610) 683-0771
Facsimile: (610) 683-0777
**JOkade@AOL.com**


Julia Lowenfeld
1706 Sheepshead Bay Road
Brooklyn, New York 11235
Telephone: (718) 648-4888
Facsimile: (718) 648-4768
Julia@lowenfeldlaw.com


**Attorneys for Plaintiff**

# EXHIBIT 1



NEW YORK CITY DEPARTMENT OF FINANCE ● PAYMENT OPERATIONS DIVISION

**FLEET PROGRAM**

# APPLICATION FOR STIPULATED FINE PARKING PROGRAMS

**Mail to: NYC Department of Finance, Attn: Stipulated Fine Programs, 59 Maiden Lane, 18th Floor, New York, NY 10038**

**INSTRUCTIONS:** Finance has two commercial parking programs that allow for payment of parking violations, based on a stipulated fine schedule.
● **NYC Delivery Solutions** - for companies with commercial fleet vehicles engaged in expeditious deliveries or services; and
● **Commercial Abatement Program** - for companies with commercial fleet vehicles engaged in commercial activity, other than expeditious deliveries or services.

When you submit this application, you will describe your business. Finance will determine which of the programs you are eligible for and enroll you in the appropriate program. We will notify you by email of your enrollment and provide you with the fine schedule at that time.

**This form serves as both application and, if approved, an enrollment form for the program.**

**SECTION I: APPLICANT INFORMATION**

1. Applicant (Company) Name:

2. D/B/A Name (if applicable, attach copy of Certificate of Assumed Name / DBA):
   "Doing Business As"

| 3. Business Address: | City: | State: | Zip Code: |
|---|---|---|---|

| 4. Mailing Address: | City: | State: | Zip Code: |
|---|---|---|---|

5. Contact Name:

| 6. Business Telephone Number: | 7. Email Address: |
|---|---|

| 8. Employer Identification Number: [  ][  ][  ] ■ [  ][  ][  ][  ][  ][  ][  ] | **IMPORTANT:** You MUST include your email address! You will not be approved for or enrolled in a program if you do not include a valid email address. This email address will be used for sending **ALL** weekly reports and bills. |
|---|---|

9. Bank Name:

| 10. Bank Address: | City: | State: | Zip Code: |
|---|---|---|---|

**SECTION II: COMMERCIAL VEHICLE INFORMATION**

1. Do you own or lease commercial vehicles? ..................................... ☐ YES   ☐ NO   If "YES", how many? _____
   If "NO", you are not eligible for the Stipulated Fine Program.

2. Are the vehicles currently enrolled in Finance's Fleet Program? ...... ☐ YES   ☐ NO
   If "YES", indicate the Fleet Registration #: _____

   **If vehicles being enrolled are leased or registered to a different owner name, a Lease Rider is required.**

**SECTION III: VEHICLE USE INFORMATION**

**Information about your business:**

1. a. Describe the nature of your business.  Check all that apply:
   ☐ Delivery Company      ☐ Service Company
   ☐ Other (Describe in detail): _____

   b. Indicate the type of delivery or service your company provides.  Check all that apply:
   ☐ Food              ☐ Beverage        ☐ Dry cleaning/laundry      ☐ Mail
   ☐ Floral            ☐ Furniture       ☐ Equipment                 ☐ Plumbing
   ☐ Contracting       ☐ Elevator        ☐ Moving Company            ☐ Exterminator
   ☐ Cleaning Company  ☐ Other (Describe in detail): _____

**Visit Finance at nyc.gov/finance**

STIP - Rev. 06.09.10

Application for NYC Delivery Solutions Parking Fine Program                                              Page 2

**SECTION III   VEHICLE USE INFORMATION   (continued)**

**Information about your commercial vehicles:**

2. a.  Describe the type of work you use your vehicle(s) for: _____

_____

  b.  Indicate the approximate length of time your vehicles are usually parked at each job/stop: _____

  c.  Indicate the longest amount of time that your vehicle(s) will be parked in one location: _____

I certify that all information contained in this application is true and correct to the best of my knowledge and belief.  I understand that willfully making a false statement of a material fact will subject me to the provisions of law relevant to the making and filing of a false instrument and will render this application null and void.

Name _____          Date _____

Signature _____

**SECTION IV   COMMERCIAL VEHICLE PLATE ENROLLMENT**

Please list all vehicles associated with your business in the section below (attach additional sheets if necessary).  All vehicles listed below will be enrolled in Finance's Fleet Program so that you can begin to receive consolidated electronic statements of the parking violations issued to your plates.  Note that only vehicles with commercial plates are eligible for the reduced fines through the Stipulated Fine Program.

|    | VEHICLE PLATE NUMBER | STATE | PLATE TYPE |
|----|----------------------|-------|------------|
| 1  |                      |       |            |
| 2  |                      |       |            |
| 3  |                      |       |            |
| 4  |                      |       |            |
| 5  |                      |       |            |
| 6  |                      |       |            |
| 7  |                      |       |            |
| 8  |                      |       |            |
| 9  |                      |       |            |
| 10 |                      |       |            |
| 11 |                      |       |            |
| 12 |                      |       |            |
| 13 |                      |       |            |
| 14 |                      |       |            |
| 15 |                      |       |            |
| 16 |                      |       |            |
| 17 |                      |       |            |
| 18 |                      |       |            |
| 19 |                      |       |            |
| 20 |                      |       |            |

## SECTION V - CERTIFICATION

The undersigned agrees that all plates submitted for registration in the Fleet Program are and will be registered with the NYS Department of Motor Vehicles or leased in our company's name at the business address shown above.  We understand that if we submit plates for Fleet registration which are not registered to or leased by our name and address, such plates may be dropped from the Fleet Program without prior notice, unless a Lease Rider has been provided.  We will abide by the Fleet Program's terms and conditions.  We understand that a failure to comply with these terms and conditions may lead to the suspension or loss of our privilege to participate in the Fleet Program.

If your company does not have a corporate seal/stamp, you must provide *a copy of one* of the following documents:

- Certificate of Business
- Certicate of Incorporation, or
- LLC Certification

_____                    _____
Print Corporate Officer's Name                                           Print Title, (if any)


_____                    _____
Corporate Officer's Signature                                            Date


Place
Corporate
Seal
Here

### NYC DEPARTMENT OF FINANCE

# APPLICATION FOR STIPULATED FINE PARKING PROGRAMS

## ENROLLMENT AGREEMENT

I,_____, hold the position of_____,
  <span style="font-size:smaller">NAME</span>                                                                                                    <span style="font-size:smaller">TITLE</span>

am authorized to enroll my company,_____, in a NYC Parking
                                                        <span style="font-size:smaller">COMPANY NAME</span>

Program, which is a stipulated fine program for the payment of parking tickets for vehicles enrolled in the NYC Department of Finance's ("Finance") commercial fleet vehicle program.

I certify that our vehicles are used in the manner and parked for the time periods described in the attached application. My assertions in the attached application are incorporated into the terms of this agreement. I will notify Finance if my vehicle use changes.

By enrolling in this program, I agree to the following:

**Enrollment:** Finance is authorized to enroll my company in a stipulated fine program, as determined by Finance to be appropriate for my company.

**Stipulated Fines:** I agree to stipulated fines, as determined by Finance, which will be fixed percentages of violations issued in categories determined by Finance to be amenable, partially-amenable and non-amenable. Finance may change any stipulated fine schedule without providing notice. Any summons issued to an enrolled vehicle that is outstanding but not yet adjudicated prior to this agreement will be paid according to the stipulated fine schedule.

**Existing Summonses Payment:** Payment will be due in 3 equal installments: the first within 15 days of Finance providing notice of the amount due, the second approximately 30 days later, and the final installment due approximately 30 days after that.

**Billing:** Finance will issue electronic weekly fleet reports listing the number of violations issued, the violation categories and the amount due.  Fleet reports will be sent only by email on a weekly basis. If my email address changes, I am obligated to notify Finance.

**Payment:** Payment of the amount indicated on the fleet reports must be made within 15 days of receipt. Failure to pay timely may result in removal from the program and the imposition of penalties and a default judgment. Finance may require electronic payment.

**Voluntary Enrollment:** Enrollment in a NYC Parking Program (both NYC Delivery Solutions & Commercial Abatement) is voluntary and may be terminated at any time by either party, for any reason. Cancellation shall become effective 10 days following the receipt of written notice from the canceling party.

**Waiver of Right to Contest Summonses:** For any summonses issued to an enrolled vehicle, the Company waives all rights to a hearing, and agrees to accept the determinations as final. The summonses shall be deemed finally adjudicated and may not be challenged, contested or otherwise adjudicated by any party, for any reason, either administratively or in court. This waiver applies to all summonses issued prior to this agreement that have not yet been adjudicated as well as those issued after.

_____          _____
Name                                                              Signature

_____          _____
Date                                                               Title

| VIO CODE | VIOLATION DESCRIPTION | REGULAR FINE — ALL OTHER AREAS — FINE AMOUNT | REGULAR FINE — MANH 96th ST. & SOUTH — FINE AMOUNT | REDUCED FINE AMOUNTS — ALL OTHER AREAS — STIP FINE (prior to 2009-07-01) | REDUCED FINE AMOUNTS — MANH 96th ST. & SOUTH — STIP FINE B (prior to 2009-07-01) | REDUCED FINE AMOUNTS — ALL OTHER AREAS — STIP FINE (effective 2009-07-01) | REDUCED FINE AMOUNTS — MANH 96th ST. & SOUTH — STIP FINE B (effective 2009-07-01) |
|---|---|---|---|---|---|---|---|
| | **STIPULATED FINE SCHEDULE - JAN 2010** | | | | | | |
| 8 | IDLING | 115 | 115 | 105 | 105 | 105 | 105 |
| 9 | OBSTRUCTING TRAFFIC/INTERSECT | 115 | 115 | 105 | 105 | 105 | 105 |
| 10 | NO STOPPING-DAY/TIME LIMITS | 115 | 115 | 105 | 105 | 92 | 92 |
| 11 | NO STANDING-HOTEL LOADING | 115 | 115 | 105 | 105 | 92 | 92 |
| 12 | NO STANDING-SNOW EMERGENCY | 95 | 95 | 35 | 35 | 35 | 35 |
| 13 | NO STANDING-TAXI STAND | 115 | 115 | 105 | 105 | 92 | 92 |
| 14 | NO STANDING-DAY/TIME LIMITS | 115 | 115 | 105 | 105 | 92 | 92 |
| 15 | NO STANDING-OFF-STREET LOT | 115 | 115 | 40 | 40 | 40 | 40 |
| 16 | NO STANDING-EXC. TRUCK LOADING | 95 | 95 | 0 | 0 | 0 | 0 |
| 17 | NO STANDING-EXC. AUTH. VEHICLE | 95 | 95 | 87 | 87 | 76 | 76 |
| 18 | NO STANDING-BUS LANE | 115 | 115 | 105 | 105 | 105 | 105 |
| 19 | NO STANDING-BUS STOP | 115 | 115 | 105 | 105 | 105 | 105 |
| 20 | NO PARKING-DAY/TIME LIMITS | 60 | 65 | 0 | 0 | 0 | 0 |
| 21 | NO PARKING-STREET CLEANING | 45 | 65 | 0 | 0 | 0 | 0 |
| 22 | NO PARKING-EXC. HOTEL LOADING | 60 | 65 | 0 | 0 | 0 | 0 |
| 23 | NO PARKING-TAXI STAND | 60 | 65 | 0 | 0 | 0 | 0 |
| 24 | NO PARKING-EXC. AUTH. VEHICLE | 60 | 65 | 0 | 0 | 0 | 0 |
| 25 | NO STANDING-COMMUTER VAN STOP | 115 | 115 | 105 | 105 | 92 | 92 |
| 26 | NO STANDING-FOR HIRE VEH STOP | 115 | 115 | 105 | 105 | 92 | 92 |
| 27 | NO PARKING-EXC. HNDICAP PERMIT | 180 | 180 | 164 | 164 | 164 | 164 |
| 28 | OVERTIME STANDING DP | 95 | 95 | 87 | 87 | 76 | 76 |
| 29 | FAILURE TO ACTIVATE METER | 35 | 65 | 20 | 28 | 20 | 28 |
| 30 | FAIL TO ACTIVATE/EXPIRED METER | 35 | 65 | 20 | 28 | 20 | 28 |
| 31 | NO STANDING-COMM METER ZONE | 115 | 115 | 0 | 0 | 0 | 0 |
| 32 | OT PARKING-MISSING/BROKEN METR | 35 | 65 | 0 | 0 | 0 | 0 |
| 33 | FEEDING METER | 35 | 65 | 0 | 0 | 0 | 0 |
| 34 | EXPIRED METER | 35 | 65 | 0 | 0 | 0 | 0 |
| 35 | SELLING/OFFERING MCHNDSE-METER | 35 | 65 | 33 | 60 | 28 | 52 |
| 36 | SELLING MCHNDSE-OFF-STREET-LOT | 45 | 65 | 42 | 60 | 28 | 52 |
| 37 | EXPIRED MUNI METER | 35 | 65 | 0 | 0 | 0 | 0 |
| 38 | FAIL TO DSPLY MUNI METER RECPT | 35 | 65 | 20 | 28 | 20 | 28 |
| 39 | OVERTIME PKG-TIME LIMIT POSTED | 60 | 65 | 0 | 0 | 0 | 0 |
| 40 | FIRE HYDRANT | 115 | 115 | 105 | 105 | 105 | 105 |
| 41 | MISCELLANEOUS | 0 | 0 | 0 | 0 | 0 | 0 |
| 42 | EXPIRED MUNI MTR-COMM MTR ZN | 35 | 65 | 33 | 60 | 28 | 52 |
| 43 | EXPIRED METER-COMM METER ZONE | 35 | 65 | 33 | 60 | 28 | 52 |
| 44 | PKG IN EXC. OF LIM-COMM MTR ZN | 35 | 65 | 33 | 60 | 28 | 52 |
| 45 | TRAFFIC LANE | 115 | 115 | 40 | 40 | 40 | 40 |
| 46 | DOUBLE PARKING | 115 | 115 | 0 | 0 | 0 | 0 |
| 47 | DOUBLE PARKING-MIDTOWN COMML | 115 | 115 | 105 | 105 | 92 | 82 |
| 48 | BIKE LANE | 115 | 115 | 105 | 105 | 105 | 105 |
| 49 | EXCAVATION-VEHICLE OBSTR TRAFF | 95 | 95 | 87 | 87 | 76 | 76 |
| 50 | CROSSWALK | 115 | 115 | 105 | 105 | 105 | 105 |
| 51 | SIDEWALK | 115 | 115 | 105 | 105 | 105 | 105 |
| 52 | INTERSECTION | 115 | 115 | 105 | 105 | 105 | 105 |
| 53 | SAFETY ZONE | 115 | 115 | 105 | 105 | 105 | 105 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 54 | TUNNEL/ELEVATED/ROADWAY | 25 | 40 | 24 | 38 | 20 | 32 |
| 55 | ELEVATED/DIVIDED HIGHWAY/TUNNL | 115 | 115 | 105 | 105 | 92 | 92 |
| 56 | DIVIDED HIGHWAY | 115 | 115 | 105 | 105 | 92 | 92 |
| 57 | BLUE ZONE | 65 | 65 | 0 | 0 | 0 | 0 |
| 58 | MARGINAL STREET/WATER FRONT | 45 | 65 | 42 | 60 | 36 | 52 |
| 59 | ANGLE PARKING-COMM VEHICLE | 115 | 115 | 0 | 0 | 0 | 0 |
| 60 | ANGLE PARKING | 45 | 65 | 42 | 60 | 36 | 52 |
| 61 | WRONG WAY | 45 | 65 | 42 | 60 | 36 | 52 |
| 62 | BEYOND MARKED SPACE | 45 | 65 | 0 | 0 | 0 | 0 |
| 63 | NIGHTTIME STD/ PKG IN A PARK | 95 | 95 | 87 | 87 | 76 | 76 |
| 64 | NO STANDING EXCP D/S | 95 | 95 | 87 | 87 | 76 | 76 |
| 65 | OVERTIME STDG D/S | 95 | 95 | 87 | 87 | 76 | 76 |
| 66 | DETACHED TRAILER | 45 | 65 | 42 | 60 | 36 | 52 |
| 67 | PEDESTRIAN RAMP | 165 | 165 | 150 | 150 | 150 | 150 |
| 68 | NON-COMPLIANCE W/ POSTED SIGN | 60 | 65 | 0 | 0 | 0 | 0 |
| 69 | FAIL TO DISP. MUNI METER RECPT | 35 | 65 | 20 | 28 | 20 | 28 |
| 70 | REG. STICKER-EXPIRED/MISSING | 65 | 65 | 28 | 28 | 28 | 28 |
| 71 | INSP. STICKER-EXPIRED/MISSING | 65 | 65 | 28 | 28 | 28 | 28 |
| 72 | INSP STICKER-MUTILATED/C'FEIT | 65 | 65 | 28 | 28 | 28 | 28 |
| 73 | REG STICKER-MUTILATED/C'FEIT | 65 | 65 | 28 | 28 | 28 | 28 |
| 74 | FRONT OR BACK PLATE MISSING | 65 | 65 | 28 | 28 | 28 | 28 |
| 75 | NO MATCH-PLATE/STICKER | 65 | 65 | 60 | 60 | 52 | 52 |
| 76 | VIN OBSCURED | 65 | 65 | 0 | 0 | 0 | 0 |
| 77 | PARKED BUS-EXC. DESIG. AREA | 45 | 65 | 23 | 28 | 23 | 28 |
| 78 | NGHT PKG ON RESID STR-COMM VEH | 65 | 65 | 28 | 28 | 28 | 28 |
| 79 | UNAUTHORIZED BUS LAYOVER | 115 | 115 | 40 | 40 | 40 | 40 |
| 80 | MISSING EQUIPMENT | 45 | 60 | 23 | 26 | 23 | 26 |
| 81 | NO STANDING EXCP DP | 95 | 95 | 87 | 87 | 76 | 76 |
| 82 | COMML PLATES-UNALTERED VEHICLE | 115 | 115 | 40 | 40 | 40 | 40 |
| 83 | IMPROPER REGISTRATION | 65 | 65 | 60 | 60 | 52 | 52 |
| 84 | PLTFRM LFTS LWRD POS COMM VEH | 45 | 65 | 23 | 28 | 23 | 28 |
| 85 | STORAGE-3HR COMMERCIAL | 65 | 65 | 28 | 28 | 28 | 28 |
| 86 | MIDTOWN PKG OR STD-3HR LIMIT | 115 | 115 | 40 | 40 | 40 | 40 |
| 87 | UNALTERED COMM VEHICLE | 115 | 115 | 40 | 40 | 40 | 40 |
| 88 | UNALTERED COMM VEH-NME/ADDRESS | 115 | 115 | 40 | 40 | 40 | 40 |
| 89 | NO STD(EXC TRKS/GMTDST NO-TRK) | 115 | 115 | 0 | 0 | 0 | 0 |
| 90 | VEH-SALE/WSHNG/RPRNG/DRIVEWAY | 25 | 40 | 24 | 38 | 20 | 32 |
| 91 | VEHICLE FOR SALE(DEALERS ONLY) | 45 | 65 | 42 | 60 | 36 | 52 |
| 92 | WASH/REPAIR VEHCL-REPAIR ONLY | 45 | 65 | 42 | 60 | 36 | 52 |
| 93 | REMOVE/REPLACE FLAT TIRE | 65 | 65 | 42 | 60 | 42 | 60 |
| 96 | RAILROAD CROSSING | 95 | 95 | 87 | 87 | 76 | 76 |
| 97 | VACANT LOT | 45 | 65 | 42 | 60 | 36 | 52 |
| 98 | OBSTRUCTING DRIVEWAY | 95 | 95 | 35 | 35 | 35 | 35 |
| 99 | OTHER | 105 | 105 | 38 | 38 | 38 | 38 |

# EXHIBIT 2

```
RUN DATE: 09/26/09                                                                                              REPORT ID:   SNRPT155
RUN TIME: 10:49:58                     NEW YORK CITY PARKING VIOLATIONS BUREAU                                   REPORT PAGE:     2064
                                            FLEET SUMMONS ISSUANCE REPORT                                        AGENCY PAGE:       11
                                       PERIOD COVERED: 09/19/09 - 09/26/09
REGISTRATION NUMBER:                   NEWLY ISSUED - STIPULATED FINE SUMMONSES
KEN THORPE

1706 SHEEPSHEAD BAY
BROOKLYN    NY   11235
```

| PLATE ID-ST-TYP | SUMMONS NO. | DOCKET NO. | ISSUE DATE | VIOL TIME | VIOLATION DESC | VC | FIN | +PN | +INT | -RED | -PAY | = OPEN | PREVIOUS | REAS CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NYCOM | 7820247447 | 0000000000 | 09/18/09 | 0945A | DBL PKG-MIDTOWN | 47 | 115 | 0 | 0 | 33 | 0 | 82.00 | | FLAB |
| NYCOM | 7847410760 | 0000000000 | 09/19/09 | 0247P | NO MUNI MTR REC | 69 | 65 | 0 | 0 | 37 | 0 | 28.00 | | FLAB |
| NYCOM | 7862918423 | 0000000000 | 09/19/09 | 1106A | NO MUNI MTR REC | 69 | 65 | 0 | 0 | 37 | 0 | 28.00 | | FLAB |
| NYCOM | 7421404612 | 0000000000 | 09/22/09 | 0853A | TRAFFIC LANE | 45 | 115 | 0 | 0 | 75 | 0 | 40.00 | | FLAB |
| NYCOM | 7909755004 | 0000000000 | 09/19/09 | 1056A | NO STD-TAXI STD | 13 | 115 | 0 | 0 | 23 | 0 | 92.00 | | FLAB |
| NYCOM | 7915640719 | 0000000000 | 09/18/09 | 0137P | FAIL DSPLY RECT | 38 | 65 | 0 | 0 | 37 | 0 | 28.00 | | FLAB |
| NYCOM | 7842524415 | 0000000000 | 09/22/09 | 0400P | TRAFFIC LANE | 45 | 115 | 0 | 0 | 75 | 0 | 40.00 | | FLAB |
| NYCOM | 7889419193 | 0000000000 | 09/18/09 | 0222P | TRAFFIC LANE | 45 | 115 | 0 | 0 | 75 | 0 | 40.00 | | FLAB |
| NYCOM | 7899333933 | 0000000000 | 09/18/09 | 0127P | TRAFFIC LANE | 45 | 115 | 0 | 0 | 75 | 0 | 40.00 | | FLAB |
| NYCOM | 1283182567 | 0000000000 | 09/09/09 | 0541P | DOUBLE PKG | 46 | 115 | 0 | 0 | 115 | 0 | 0.00 | | FLAB |
| NYCOM | 7876992328 | 0000000000 | 09/17/09 | 0113P | DBL PKG-MIDTOWN | 47 | 115 | 0 | 0 | 33 | 0 | 82.00 | | FLAB |
| NYTRC | 7543903581 | 0000000000 | 09/17/09 | 0226P | NO STD-BUS STOP | 19 | 115 | 0 | 0 | 10 | 0 | 105.00 | | FLAB |
| NYTRC | 7129025967 | 0000000000 | 09/16/09 | 0204P | EXPIRED METER | 34 | 35 | 0 | 0 | 35 | 0 | 0.00 | | FLAB |
| NYTRC | 7430232938 | 0000000000 | 09/17/09 | 0839A | TRAFFIC LANE | 45 | 115 | 0 | 0 | 75 | 0 | 40.00 | | FLAB |
| NYTRC | 7441509245 | 0000000000 | 09/17/09 | 0146P | TRAFFIC LANE | 45 | 115 | 0 | 0 | 75 | 0 | 40.00 | | FLAB |
| NYTRC | 7442536918 | 0000000000 | 09/18/09 | 1233P | TRAFFIC LANE | 45 | 115 | 0 | 0 | 75 | 0 | 40.00 | | FLAB |
| NYTRC | 7450597690 | 0000000000 | 09/18/09 | 0309P | TRAFFIC LANE | 45 | 115 | 0 | 0 | 75 | 0 | 40.00 | | FLAB |
| NYTRC | 7786553605 | 0000000000 | 09/16/09 | 1214P | TRAFFIC LANE | 45 | 115 | 0 | 0 | 75 | 0 | 40.00 | | FLAB |

RUN DATE: 09/26/09
RUN TIME: 10:49:58

NEW YORK CITY PARKING VIOLATIONS BUREAU
FLEET SUMMONS ISSUANCE REPORT
PERIOD COVERED: 09/19/09 - 09/26/09
NEWLY ISSUED - STIPULATED FINE SUMMONSES

REPORT ID:     SWRPT155
REPORT PAGE:       2049
AGENCY PAGE:          1

REGISTRATION NUMBER:
KEN THORPE

1706 SHEPSHEAD BAY
BROOKLYN     NY    11235

| PLATE ID-ST-TYP | SUMMONS NO. | DOCKET NO. | ISSUE DATE | VIOL TIME | VIOLATION DESC | VC | FIN+PN+INT-RED-PAY | PREVIOUS - OPEN | REAS CODE |
|---|---|---|---|---|---|---|---|---|---|
| ********** | | | | | | | | | |
| NYCOM | 7386948797 | 0000000000 | 09/17/09 | 0252P | EXPIRED METER | 34 | 35 | 0 0 35 0 | 0.00 FLAB |
| NYCOM | 1279953135 | 0000000000 | 09/09/09 | 1056A | NO STD-BUS STOP | 19 | 115 | 0 0 10 0 | 105.00 FLAB |
| NYCOM | 7440594642 | 0000000000 | 09/22/09 | 0153P | TRAFFIC LANE | 45 | 115 | 0 0 75 0 | 40.00 FLAB |
| NYCOM | 7443391960 | 0000000000 | 09/22/09 | 1246P | TRAFFIC LANE | 45 | 115 | 0 0 75 0 | 40.00 FLAB |
| NYCOM | 1279424205 | 0000000000 | 09/12/09 | 0912A | DOUBLE PKG | 46 | 115 | 0 0 115 0 | 0.00 FLAB |
| NYCOM | 7533008820 | 0000000000 | 09/18/09 | 1108A | NO STD-BUS STOP | 19 | 115 | 0 0 10 0 | 105.00 FLAB |
| NYCOM | 7580985317 | 0000000000 | 09/16/09 | 1151A | TRAFFIC LANE | 45 | 115 | 0 0 75 0 | 40.00 FLAB |
| NYCOM | 7580985305 | 0000000000 | 09/16/09 | 1150A | EXP/MSG REG STK | 70 | 65 | 0 0 37 0 | 28.00 FLAB |
| NYTRC | 7143075334 | 0000000000 | 09/16/09 | 1040A | EXPIRED METER | 34 | 35 | 0 0 35 0 | 0.00 FLAB |
| NYTRC | 7112169082 | 0000000000 | 09/17/09 | 0920A | TRAFFIC LANE | 45 | 115 | 0 0 75 0 | 40.00 FLAB |
| NYTRC | 7185292487 | 0000000000 | 09/18/09 | 1236P | TRAFFIC LANE | 45 | 115 | 0 0 75 0 | 40.00 FLAB |
| NYTRC | 7686934846 | 0000000000 | 09/18/09 | 0101P | TRAFFIC LANE | 45 | 115 | 0 0 75 0 | 40.00 FLAB |
| NYTRC | 7688159295 | 0000000000 | 09/18/09 | 0915A | NO STD-TAXI STD | 13 | 115 | 0 0 23 0 | 92.00 FLAB |
| NYTRC | 7783688822 | 0000000000 | 09/19/09 | 1226P | NO STD-BUS STOP | 19 | 115 | 0 0 10 0 | 105.00 FLAB |
| NYTRC | 7185292840 | 0000000000 | 09/19/09 | 1137A | TRAFFIC LANE | 45 | 115 | 0 0 75 0 | 40.00 FLAB |
| NYTRC | 7784956071 | 0000000000 | 09/16/09 | 1248P | TRAFFIC LANE | 45 | 115 | 0 0 75 0 | 40.00 FLAB |
| NYTRC | 7112169550 | 0000000000 | 09/18/09 | 1219P | NO STD-LIMITS | 14 | 115 | 0 0 23 0 | 92.00 FLAB |
| NYTRC | 7143384203 | 0000000000 | 09/16/09 | 0925A | NO PKG-STR CLN | 21 | 45 | 0 0 45 0 | 0.00 FLAB |
| ********** | | | | | | | | ****** | |

# EXHIBIT 3

# NYCServ Violation Copy
## Internet



1276771472

---

**The City of New York Notice of Parking Violation**

Date Registration Expires - M/S

**0 1 3 1 1 0**

Name of Operator, if present.
If not present, then Owner of Vehicle Bearing License.
Operator Present but ID Refused?
N/S = Not Shown

PLATE: **2 6 1 6 2 J V**    CD **5**

PLATE TYPE: PAS  OMT  COM  OTHER PLATE TYPE    N/S

BODY TYPE: Sdn  Van  Subn  Delv  Trlr  P/U  Taxi

STATE: NY  CT  PA  NJ  MA  FL  VA  Maine  NC  Other    Color **BK**    Model Yr **06**

MAKE: Chev  Ford  Honda  Dodge  Jeep  Linco  Int'l  Toyot  Nissn  Mssn  Mer/Be  GMC  Mazda  OTHER

ALT PLATE:    State    NY  Kings  Bronx  Qns  Rich  County

**THE OPERATOR & OWNER OF THE ABOVE VEHICLE ARE CHARGED AS FOLLOWS:**

Time **1 3 0** PM/AM    Date of Offense **0 5 0 0 9**

Time 1st Observed  AM/PM    Date 1st Observed    Precinct **0 2 6**

Front of  Place of Occurrence    Opposite

**126  Riverside Dr.**

| Code | All Other Areas | Manhattan 96th St & South | CHARGED VIOLATION OF SECTION 4-08 (SUBSECTION BELOW) OF NYC TRAFFIC RULES |
|---|---|---|---|
| 34 | $35 | $65 | Expired Meter (h)(2) |
| 37 | $35 | $65 | Expired Muni-Meter (h)(10) |
| 38 | $35 | $65 | Fail to Disp. Muni-Meter Receipt (h)(13) |
| 20 | $60 | $60 | No Parking (e) |
| 21 | $45 | $65 | No Parking, SCR (d)(1) |
| 27 | $180 | | No Parking Except Handicap Plates/Permits (d)(2) |
| 78 | | $65 | Nighttime Prkg Comm. Vehicle Residential St. (k)(6) |
| 16 | $95 | $95 | No Standing Except Trucks loading/unloading (k)(2) |
| 31 | | $115 | No Standing Commercial Metered Parking (h)(9) |
| 17 | $95 | | No Standing Except Auth. Vehicles (c) |
| 19 | | $115 | No Standing Bus Stop (c)(3) |
| 14 | $115 | | No Standing (c) |
| 46 | $115 | | Double Parking (f)(1) |
| 70 | $65 | | Registration Sticker ((l)(3) NYS Only |
| 71 | | $65 | Inspection Sticker ((l)(6) NYS Only |
| 67 | $165 | | Pedestrian Ramp (l)(7) |
| 40 | | $115 | Fire Hydrant (e)(2) Feet From: |
| 74 | $65 | | Missing/Improperly Displayed Plate ((l)(7) |
| | $ | | Sub Section |

METER #

Operational?  Yes  No

Days in effect (ALL unless otherwise specified)
M  T  W  Th  F  Sa  Su

Hours in effect (All unless otherwise specified)
From:  AM PM
To:  AM PM

Other Description, Rider or Time Limit:

Missing Sticker #    Expired

SEE REVERSE SIDE FOR IMPORTANT INFORMATION

I affirm under penalty of perjury (penal law 210.45) that I personally observed the offense charged above, if the operator was present, I wrote the operator's name above or marked the "ID refused" oval and personally served this Notice upon her/his, if no name appears above and the "ID refused" oval is not marked, I affixed this Notice to the vehicle.    Rev. 2/09

Signature of Issuing Agent    ISSUING AGENCY **NYPD**  QAID **0 0 2 0**

Name of Complainant (printed)    Tax Reg. No. **9 3 9 7 9 7**
**PASCHALL**

---

**127677147-2**

---

# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NYTDA, INC. a/k/a
NEW YORK TRUCKING
& DELIVERY ASSOCIATION,
individually and on behalf of all others
similarly situated,

        Plaintiff,

v.

THE CITY OF NEW YORK, ACTING THROUGH
THE TRAFFIC CONTROL DIVISION OF THE NEW
YORK CITY POLICE DEPARTMENT, AND THE
NEW YORK CITY DEPARTMENT OF FINANCE,
STEPHEN GOLDSMITH, DAVID M. FRANKEL,
JAMES TULLER, HARRY J. WEDIN, AND JOHN
AND JANE DOES 1-10, ALL IN THEIR
OFFICIAL CAPACITIES,

        Defendants.

Civil Action No. _____

CLASS ACTION
COMPLAINT

James H. Lowenfeld (JHL-9387)
350 Central Park West, Suite 13-C
New York, New York 10025
Telephone: (917) 439-3906
Facsimile: (212) 531-6090
jlowenfeld@gmail.com
Attorney for Plaintiff

# NYCServ Violation Copy
## Internet



7795703392

---

## The City of New York
### Notice of Parking Violation

THE NYC DEPARTMENT OF FINANCE MUST RECEIVE YOUR ANSWER TO THIS NOTICE WITHIN THIRTY (30) DAYS FROM THE OFFENSE OR YOU WILL BE SUBJECT TO AN ADDITIONAL $10 PENALTY YOU CAN RESPOND BY MAIL, THROUGH THE INTERNET, OR IN PERSON  FAILURE TO ANSWER AS REQUIRED SHALL BE DEEMED AN ADMISSION OF LIABILITY, ADDITIONAL PENALTIES WILL BE CHARGED AND A DEFAULT JUDGEMENT MAY BE ENTERED AGAINST YOU  VEHICLES OWNED BY PERSONS WITH OUTSTANDING DEFAULT JUDGEMENTS MAY BE TOWED

N/S=Not Shown
N/A=Not Applicable

| Permit Displayed | Permit Number | Type |
|---|---|---|
| N/S | N/A | N/A |

**Name of the Operator, if present.  If not present:**
OWNER OF THE VEHICLE BEARING LICENSE

| Plate | CD | Exp. Date | State | Plate Type |
|---|---|---|---|---|
| C488573 | NS | 04/13 | DE | PAS |

| Make | Color | Year | Body Type |
|---|---|---|---|
| FORD | WHT | N/S | UTIL |

VIN #

THE OPERATOR AND OWNER OF THE ABOVE VEHICLE ARE CHARGED AS FOLLOWS:

In Violation of Sect. 4-08 (Subsect. Below) of NYC Traffic Rules

Traffic Lane (e)(1)

**Place of Occurrence**

Front of 1957 Bronxdale Ave

| VC | Meter # | Operational | Limit | County | Pct. |
|---|---|---|---|---|---|
| 45 | | | | BX | 049 |

| Date/Time of Offense | Date/Time 1st Observed |
|---|---|
| 06/16/08  12:38 PM | N/A |

Complainant's Comments:
blocking traffic lane
Obstructing Traffic.

FINE AMOUNT:     $ 115.00

| Agency | Command | Tax Reg # |
|---|---|---|
| TRAFFIC | T-202 | 351342 |

**Complainant's Name**

A.A.GOODWIN

**Signature of Complainant**

I affirm under penalty of perjury (Penal Law 210 45) that I personally observed the offense charged above,  if the operator was present I indicated the operator's name or indicated "ID Refused" and personally served this Notice upon him/her, if the operator was not present or refused to accept personal service of this Notice, I affixed this Notice to the vehicle

X

# EXHIBIT 5

POLICE DEPARTMENT
CITY OF NEW YORK

October 1, 2010

From:      Commanding Officer, Parking Enforcement District

To:        All Parking Enforcement Personnel

Subject:   ENFORCEMENT OF COMMERCIAL DOUBLE PARKING RULES


1.      Members of the service are reminded that there are only two (2) sections of the Traffic Regulations that are applicable with regard to the issuance of a summons for an illegally double parked commercial vehicle:  Traffic Regulations Section 4-08 (L)(2) for commercial vehicles illegally double parked within the Midtown core and Section 4-08 (F)(1) for commercial vehicles illegally double parked outside of the Midtown core.

2.      The Midtown core rule applies to the area that is encompassed by 1st Avenue to 8th Avenue, from 14th Street to 60th Street (all inclusive), from 7am to 7pm, all days except Sunday. Again, the proper issuance code for this violation is Traffic Regulations 4-08 (L)(2).  On Sunday or between the hours of 7pm to 7am, an illegally double parked commercial vehicle within the core will be issued the appropriate summons under Traffic Regulations Section 4-08 (F)(1).

3.      The issuance of a summons to a double parked vehicle outside the Midtown core, or within the Midtown core on Sunday, or between the hours of 7pm to 7am under Traffic Regulations Section 4-08(F)(1) is not automatic.  A summons may only be issued under Traffic Regulations Section 4-08 (F)(1) if there is an unoccupied space within 100 feet of the commercial vehicle on either side of the street, or the commercial vehicle has been double parked for more than 30 minutes with no activity.  When issuing a summons to a double parked commercial vehicle under Traffic Regulations Section 4-08 (F)(1) the member concerned must enter under the "comments" section of the summons either of the following:  "Space available within ___ feet" (member must enter the number of feet, and that number must be less than 100 feet) or "No activity observed for_____minutes" (member must enter a time first observed, and the issuance time must be more than 30 minutes).

4.      Under NO CIRCUMSTANCES should a summons be issued to a double parked commercial vehicle for OBSTRUCTING A TRAFFIC LANE.

5.  For your information and compliance.


                                        Michael Pilecki
                                        Deputy Inspector